UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


CHILDREN'S LEGAL SERVICES PLLC,

    Plaintiff,

-vs-

SIMON KRESCH,

    Defendant/Counter-Plaintiff,

SAIONTZ, KIRK, & MILES, P.A., and
JOHN DOES 1-10,

    Defendants.

Case No. 07-10255
Hon. Avern Cohn

_____/

# MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. Introduction

This is a service mark infringement case brought under sections 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a). Plaintiff Children's Legal Services PLLC ("CLS") is the registered owner of marks containing the words "My Child" which it uses in the form of phone numbers and in other ways to advertise legal services to parents of children injured by medical malpractice. CLS claims that Defendant Simon Kresch ("Kresch") uses marks confusingly similar to those owned by CLS to market similar legal services in markets in which CLS is active. CLS also claims that Defendant

1

law firm Saiontz, Kirk, & Miles, P.A. ("Saiontz") conducts infringing activities with respect to CLS's phone number and website in concert with Kresch. Kresch counterclaims for common law service mark infringement, trademark infringement, unfair competition and cyberpiracy.

Before the Court are defendants' and CLS's cross-motions for summary judgment as to the claims asserted by CLS. For the reasons that follow, the Court will deny defendant's motion, grant plaintiff's motion as against Kresch, and deny plaintiff's motion as against Saiontz.

## II. Facts

The following are the facts as gleaned from the record. There are some minor factual disputes, but none bear on the dispositive issues in the case.

A number of marks containing the words "MY CHILD,"[1] which are used to advertise legal services for parents of children with birth defects or other injuries caused by medical malpractice, are in dispute. Over the past decade, three entities are known to have used such marks: (1) CLS and its predecessors; (2) Kresch; (3) Attorney Advantage Advertising, Inc. ("AAAI"), a legal marketing firm that ceased to conduct business in 2000 or 2001 and is not a party to this action.

### A. AAAI

In 1995, attorneys Charles Brofman and James Burchetta created a marketing program called "Why did it happen to my child?" The program was designed to

---

[1] The marks at issue are, among others, "1-800-MYCHILD," "1-800-4MYCHILD," "1-888-4MYCHILD," "1-888-2MYCHILD," "www.1-800-mychild.com" and "www.4mychild.com."

generate business for Brofman and Burchetta's law firm from parents of children with disabilities caused by medical malpractice. As part of the program, Brofman and Burchetta obtained a telephone number, 1-888-269-2445, and promoted it in advertising as 1-888-2MYCHILD. Brofman and Burchetta also formed AAAI to handle the marketing portion of the program. Their law firm, Burchetta, Brofman, & Hanley LLP ("BBH"), managed case intake and medical review.

AAAI and BBH contracted with other law firms to become "affiliates" of the program. Affiliated firms paid fees to AAAI for marketing and administrative support and to BBH for assistance in conducting medical reviews and other aspects of malpractice litigation. In return, the affiliated firms received referrals from business generated by AAAI. By the fall of 1996, there were approximately 20 to 25 affiliated law firms on the east coast of the United States. At the same time, AAAI initiated a national television advertising campaign featuring the "Why did it happen to my child?" slogan and the 1-888-2MYCHILD phone number.

In October 1996, the law firm Stern & Associates contracted with BBH to become the designated affiliate for the Detroit metropolitan area for a six-month period. Now defunct, Stern & Associates was partially owned by malpractice attorney Kenneth Stern ("Stern"). Stern is now the sole owner of CLS. The affiliation contract stated that Stern & Associates was not given "license, sub-license or permission of any kind" to use the slogan and phone number "in any of his or her own advertisements."

In a 2004 letter, Brofman stated that BBH forwarded approximately 150 potential clients to Stern & Associates between October 1996 and April 1997. Brofman further stated that Stern & Associates never paid the agreed upon fees to BBH. The affiliation

agreement between BBH and Stern & Associates expired in April 1997 and was not renewed. AAAI ceased to conduct business in approximately 2000.

## B. CLS and Its Predecessors

### 1. Stern & Associates

In January 1997, while still under contract with BBH and AAAI to receive referrals of cases that AAAI obtained through its 1-888-2MYCHILD phone number, Stern & Associates began to air local television advertisements in Michigan and Tennessee for the same type of legal services. The Stern & Associates advertisements featured a phone number, 1-888-469-2445, listed under the mnemonic 1-888-4MYCHILD. Stern says that he and his partner at Stern & Associates, attorney Larry Korn, had independently conceived of the 4MYCHILD service mark "between 1995 and 1996."[2] In May 1997, Stern & Associates purchased national advertising on the Black Entertainment Television network that ran for several months; in September 1997, Stern & Associates began to run similar advertisements on the national PAX television network. In April 1998, Stern & Associates launched a website with the domain name http://www.4mychild.com. Stern says that callers responding to any of the advertisements were sent a brochure, created in 1997, that also used the "4MYCHILD" mark.

---

[2] This seems improbable in light of the fact that there is no documentation of Stern & Associates' use of any such mark prior to its entering into the affiliation contract with AAAI.

## 2. I.P. International, Inc.

At some point prior to March 1997, David Houston ("Houston"), identified in the record as friend of Stern's partner Larry Korn, formed a company in the Cayman Islands known as I.P. International, Inc. ("IP"). In an affidavit, Houston says that he formed IP for the purpose of publishing a book dealing with issues faced by expectant mothers as part of Stern & Associates' 4MYCHILD campaign. IP was incorporated in the Cayman Islands in order to take advantage of favorable tax policies.

On March 10, 1997, IP filed a service mark application for "1-888-4MYCHILD" with the United States Patent and Trademark Office ("USPTO"). The original application stated only an "intent to use" the mark. The application was subsequently amended to state that the mark had been used in commerce since June 19, 1997. IP subsequently filed additional applications with the USPTO for similar marks: "FOR MY CHILD" on May 18, 2000, and "1-800-4MYCHILD" on November 27, 2001. CLS subsequently obtained from IP any rights that IP may have had to use the registered marks.

## 3. CLS

CLS is in the business of providing legal representation and other services to parents of children with cerebral palsy. On December 4, 2004, Stern formed CLS as sole owner and acquired the "4MYCHILD" marks held by Stern & Associates; Stern & Associates had filed for bankruptcy in May 2004. CLS filed additional applications with the USPTO for "1-800-4MYCHILD" and "4MYCHILD" on January 11, 2005, and for "2MYCHILD" on February 9, 2005. CLS currently advertises its services using a family

of "4MYCHILD" service marks, including telephone numbers advertised as "1-800-4MYCHILD" and "1-888-4MYCHILD" and the Internet domain name "www.4mychild.com."

On July 2, 2007, CLS entered into a settlement agreement and mutual release with AAAI. Although AAAI ceased to do business sometime ago, the parties do not contest that at the time Brofman had the authority to make contracts on AAAI's behalf. Pursuant to the agreement, AAAI transferred to CLS

> all statutory and/or common-law rights that Brofman Parties have or may have, to do business in the name of, or use in commerce as trademarks or service marks, the following: MY CHILD, 2MYCHILD, 1-888-2MYCHILD, WHY MY CHILD? WHY DID IT HAPPEN TO MY CHILD? and any and all similar marks, specifically including any marks containing the words "MY CHILD." . . . The Brofman parties also irrevocably transfer to CLS all rights to prosecute all infringers of the 2MYCHILD Marks, to collect damages therefore, and take all other actions associated with ownership or enjoyment of the 2MYCHILD Marks.

### C.  Kresch

On November 5, 1997, Kresch acquired the phone number 1-800-692-4453. Shortly thereafter he began to market the phone number as 1-800-MYCHILD. Kresch was also in the business of marketing legal services to parents of children suffering from birth-related injuries. Telephone records indicate that Kresch received calls at 1-800-MYCHILD continuously beginning in February 1998 and continuing at least through February 2007.

In the fall of 1998, Kresch approached a friend, Mintzi Schramm ("Schramm"), the owner of a local editing service named Writer's Aide, about creating a brochure featuring the 1-800-MYCHILD mark. Kresch planned to use the brochure as part of a

marketing campaign for his legal services. After Schramm completed the brochure, Kresch printed 10,000 copies at Goodwill Printing Company in December 1998. Kresch says that he mailed copies of the brochure in bulk mailings, but there is no documentation of any such mailing in the record. Kresch also says that he printed additional copies of the brochure after 1998. However, Goodwill's employee Brian Fishman says that Goodwill did not do any additional printing for Kresch after the initial December 1998 job, and Kresch has not produced documentation of any other printing.

CLS has proffered the record of a search performed by VMS, a media reporting service, showing no evidence of any commercial advertisement for 1-800-MYCHILD before 2003. Kresch proffers a similar report from another media reporting service, Competitive Media Reporting ("CMR"), showing activity beginning in 2003. Kresch says that CMR's search did not cover years prior to 2003, so the lack of any record of activity for those years in the CMR report is not meaningful.

Kresch has never attempted to register the "MY CHILD" mark with the USPTO.

### D. Saiontz

Saiontz is a Maryland law firm that specializes in, among other things, medical malpractice and personal injury law. Saiontz has an agreement with Kresch under which Saiontz pays a fee to Kresch in exchange for referrals from potential clients who call the 1-800-MYCHILD phone number. Saiontz says that it does not use any "MYCHILD" marks in its own advertising, and relies solely on Kresch for advertising the 1-800-MYCHILD mark. However, a Google search for "1-800-mychild.com" reveals a "sponsored link," i.e. an advertisement that must be purchased from Google, directing users to Saiontz's website, www.youhavealawyer.com.

### III. Procedural History

In March 2003, Stern & Associates filed suit against Kresch in this Court, making claims of trademark infringement and common law unfair competition. The suit was limited to Kresch's use in Michigan of 1-800-MYCHILD, which Stern & Associates claimed was confusingly similar to its own 1-800-4MYCHILD and 1-888-4MYCHILD marks. In June 2003, the parties reached an agreement pursuant to which Stern & Associates dismissed the suit without prejudice. In exchange, Kresch promised "not [to] engage in any local Michigan media advertising of any sort utilizing the 2MYCHILD campaign or any campaign or mark similar thereto." The parties memorialized the agreement in a letter, signed and dated June 16, 2003.

Kresch claims that the agreement not to use a "MYCHILD" mark in Michigan implicitly authorized him to use such a mark outside of Michigan. CLS says that the 2003 agreement was limited to Michigan because Stern & Associates was unaware that Kresch was using the mark elsewhere, and that the agreement therefore does not grant Kresch any affirmative rights to advertise elsewhere. CLS also says that Stern & Associates was fraudulently induced to enter into the agreement based on Kresch's misrepresentations.

On April 2, 2004, Kenneth A. Stern, P.C., an entity affiliated with Stern and CLS, filed a trademark application for the "MYCHILD" mark. In November 2005, Kresch filed an opposition to the application with the Trademark Trial and Appeal Board ("TTAB"). Kresch claimed superior rights to the mark by virtue of his use of 1-888-2MYCHILD, 1-800-2MYCHILD, 1-800-MYCHILD, and several related Internet domain names. Kresch failed to submit any supporting evidence, however, and on February 16, 2007, the

TTAB entered a default judgment in favor of Kenneth A. Stern, P.C., and dismissed the opposition. Kenneth A. Stern, P.C., thereafter registered the mark.

At the same time Kenneth A. Stern, P.C. filed the motion to dismiss with the TTAB, in January 2007, CLS initiated this lawsuit, claiming service mark infringement, trademark infringement, unfair competition, and cyberpiracy.

### IV. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in

9

summary judgment proceedings.  Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law."  In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52).  The Court "must view the evidence in the light most favorable to the non-moving party."  Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995).  Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact.  See Anderson, 477 U.S. at 255.  Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted.  Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

**V.  Analysis**

This case involves two types of claims under the Lanham Act.  CLS asserts a claim of service mark infringement under 15 U.S.C. § 1114, and both parties assert claims for false designation of origin under 15 U.S.C. § 1125(a)(1).  These claims can be resolved with a single inquiry into who first used the "MYCHILD" mark.

In an infringement claim under § 1114, the "touchstone of liability...is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods [or services] offered by the parties."  Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 280 (6th Cir. 1997).[3]

---

[3] Section 1114 provides in relevant part: "(1) Any person who shall, without the consent of the registrant – (a) use in commerce any reproduction, counterfeit, copy, or

The elements of a federal false designation of origin claim under § 1125(a) are (1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment of secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst customers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services. Homeowners Group, Inc. v. Home Marketing Specialists, Inc., 931 F.2d 1100, 1105 (6th Cir. 1991).[4]

## A. Likelihood of Confusion

In this case, unusually, the parties have conceded that the marks at issue are confusingly similar. CLS does so in its original complaint and Kresch in the counter-complaint. Despite the allegations he makes in the counter-complaint, Kresch now argues in his reply brief in support of its motion for summary judgment that the marks are not confusingly similar. This argument fails since "[s]tatements in pleadings that acknowledge the truth of some matter alleged by an opposing party are judicial admissions binding on the party making them." Ahghazali v. Sec'y of HHS, 869 F.2d

---

colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive...shall be liable in a civil action by the registrant."

[4] Section 1125(a) provides in relevant part: "(1) Any person who, on or in connection with any goods or services...uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which– (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...shall be liable in a civil action by anyone who believes that he or she is likely to be damaged by such act."

921, 927 (6th Cir. 1989). A party may not create a factual issue and avoid summary judgment by subsequently filing papers that conflict with admissions contained in the pleadings. See Hughes v. Vanderbilt Univ., 215 F.3d 543, 549 (6th Cir. 2000).

### B. Priority

As the parties have both admitted that the marks as used are confusingly similar, the result of the case turns on which party has priority rights in the marks. It is a fundamental principle of trademark law that trademark or "service mark ownership is not acquired by federal or state registration. Rather, ownership rights flow only from prior appropriation and use in the market." Homeowners Group, 931 F.2d at 1105. However, assuming that the registration is valid, CLS's predecessors' federal registration of 1-888-4MYCHILD "serves as *prima facie* evidence of ownership and places on defendants the burden of showing its prior appropriation and continued use of their [MYCHILD] mark." Allard Enter., Inc. v. Advanced Programming Resources, Inc., 146 F.3d 350, 356 (6th Cir. 1998); see also Zazu Designs v. Loreal, S.A., 979 F.2d 499, 504 (7th Cir. 1992) ("Registration itself establishes only a rebuttable presumption of use as of the filing date"). The same principle applies to subsequent federal registration of related marks by CLS and its predecessors.

The defendants contend that the service mark registrations made by CLS and its predecessors are, for various reasons, invalid. It is not necessary to address these arguments in detail, since even assuming *arguendo* that the registrations are invalid, CLS has priority in the "MY CHILD" family of marks by virtue of its prior appropriation and use of the marks in the marketplace.

The record indicates that CLS's predecessor, Stern & Associates, began advertising the 1-888-4MYCHILD mark as a phone number as least as early as January 1997 on local television in both Tennessee and Michigan.  Stern & Associates aired similar ads on national cable television beginning in May 1997.  Stern states in an affidavit that similar ads have been aired in various markets continuously since 1997.  Stern further states that the www.4mychild.com website has been online continuously since April 1998 and has been referenced in many of the television advertisements since that time.  None of these facts are in dispute.

Kresch does not claim to have used any mark in the "MY CHILD" family prior to November 1997, when he first obtained rights to the telephone number 1-800-692-4453, which he marketed as 1-800-MYCHILD.  Reading the record in the light most favorable to Kresch, CLS's use of the "MY CHILD" family of marks antedates Kresch's use by a period of months.  Kresch does not contend that CLS failed validly to obtain rights in the marks from its predecessors, that CLS subsequently abandoned the marks, or that the prior use of the marks was insufficient to establish priority.  Because the record unambiguously establishes that CLS's predecessors made *bona fide* use of the "MY CHILD" family of marks prior to Kresch, the issue of the registration of the marks by CLS and its predecessors amounts to a red herring.  Because the record clearly establishes that its predecessors were the first to make *bona fide* use of the "MY CHILD" family of marks, CLS has priority.

Kresch argues that Stern & Associates authorized his use of the "MY CHILD" marks.  On this point, he points to the letter of June 16, 2003, which settled the aforementioned earlier dispute between himself and Stern & Associates.  As noted

above, the letter outlines an agreement whereby Stern & Associates would dismiss a service mark infringement lawsuit then pending against Kresch if Kresch would refrain from "engag[ing] in any local Michigan media advertising of any sort utilizing the 2MYCHILD campaign or any campaign or mark similar thereto." Kresch says that because he agreed only to refrain from using a "MY CHILD" mark in Michigan, the letter implicitly authorized him to use such a mark outside of Michigan. However, only advertising within Michigan was at issue in the prior dispute. Moreover, Kresch does not contest the fact that at the time the agreement was signed, Stern & Associates was unaware that Kresch used any "MY CHILD" mark anywhere outside of Michigan. In light of these facts, the letter cannot reasonably be read to authorize Kresch to use the marks outside of Michigan.

### C. Saiontz

Saiontz contends that it does not infringe because it does not use any of the family of "MY CHILD" marks. Saiontz says that it has an oral agreement with Kresch whereby Saiontz pays a fee to Kresch in exchange for referrals from potential clients who call the 1-800-MYCHILD phone number; Saiontz does not itself advertise or otherwise use a "MY CHILD" mark. In response, CLS proffers a Google internet search for "1-800-my-child.com" yielding a "sponsored link" to Saiontz's website, www.youhavealawyer.com. CLS says that such "sponsored links" must be purchased from Google and that the search thus proves that Saiontz advertises using a "MY CHILD" mark. However, no such mark appears on the Saiontz website, and on the record before the Court it is unclear how a sponsored link is purchased or who

14

purchased the "sponsored link" to Saiontz's website. In light of these uncertainties, summary judgment against Saiontz is inappropriate at this stage of the case.

## VI. Conclusion

For the reasons stated above, the defendants' motion for summary judgment is DENIED. CLS's motion for summary judgment as to liability is GRANTED as against Kresch and DENIED as against Saiontz. The deputy clerk is directed to schedule a status conference to discuss the future course of the case.

SO ORDERED.

        s/Avern Cohn
        AVERN COHN
        UNITED STATES DISTRICT JUDGE

Dated: February 29, 2008

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, February 29, 2008, by electronic and/or ordinary mail.

        s/Julie Owens
        Case Manager, (313) 234-5160